# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | No. 23-467 |
| v. | : | |
| | : | |
| KEVIN CHRISTMAS | : | |

**March 12, 2025**                                    **Anita B. Brody, J.**

## MEMORANDUM

Defendant Kevin Christmas moves to suppress physical evidence recovered from his car during a traffic stop.  For the reasons that follow, the Court will grant Christmas' motion.

## I.   FINDINGS OF FACT[1]

On June 27, 2023, Philadelphia Police Officers Frederick MacConnell, Brian Rosenbaum, and Stephanie Fazio were traveling westbound on Loudon Street in an unmarked police car driven by MacConnell.  While stopped at a stop sign at the intersection of Loudon and 11th Street, the officers observed a white 2012 Chevrolet

---

[1] After evaluating the witnesses' credibility and studying the exhibits admitted, the Court enters these findings based on facts adduced during the January 29, 2025 suppression hearing.  *See* Jan. 29, 2025 Hr'g Tr., ECF No. 44 (transcript of suppression hearing); Jan. 29, 2025 Hr'g Ex. 1 (screenshot of intersection); Jan. 29, 2025 Hr'g Ex. 2 (Officer MacConnell's June 28, 2023 body camera footage).

Traverse (driven by Christmas) travelling southbound on 11th. *See* Jan. 29, 2025 Hr'g Ex. 1 (screenshot of intersection) (hereinafter "Ex. 1"). According to MacConnell, it looked like Christmas was going to make a U-turn and "veered wide right," but after "mak[ing] eye contact with [the officers'] vehicle," changed course and continued southbound. Jan. 29, 2025 Hr'g Tr. 14:6-11, ECF No. 44 (hereinafter "Tr."). Christmas then "quickly" pulled over in front of the Boom Box Beer Deli and "almost struck" a parked minivan in the process. *Id.* at 14:11-14; *see also* Ex. 1 (screenshot of intersection showing close proximity to the deli). After "r[iding] up onto the curve," Christmas pulled off and came to a complete stop. Tr. 14:13-14; *see also id.* at 41:16-18 ("all four wheels [were] on the ground" before the officers turned on their lights and sirens).

Based on what they saw, the officers decided to stop the Traverse for careless driving, a summary offense under 75 Pa. C.S. § 3714(a), and MacConnell activated the lights and sirens on the police car. *See id.* at 14:23-15:14. After the lights and sirens were activated, but just as the police car came to a complete stop, Christmas slowly began opening the door of the Traverse. Jan. 29, 2025 Hr'g Ex. 2 at 25:52-55 (MacConnell's June 27, 2023 body camera footage showing Christmas opening the door) (hereinafter "Ex. 2"). Rosenbaum then exited the police car, walked quickly towards Christmas, and ordered him to stay inside the Traverse and show his hands. *Id.* at 26:00-02. Christmas immediately obeyed—more specifically, he

remained seated facing Rosenbaum, his door slightly ajar, with one foot out and both hands up and outstretched outside of the Traverse. *Id.* at 26:02-09. According to MacConnell, Christmas "seemed extremely nervous," "appeared as if he was ready to cry," and said "please don't do this to me . . . ." Tr. at 20:10-13. Rosenbaum then grabbed Christmas by the forearms, pulled them above his head, pulled him out and pinned him to the side of the Traverse, and began handcuffing him. *See* Ex. 2 at 26:09-27; Tr. at 33:12-17. The door swung fully open in the process. *Compare* Ex. 2 at 25:52-55 (Christmas at threshold of Traverse before Rosenbaum approached) *with id.* at 26:11-15 (Rosenbaum forcibly removing Christmas and the door swinging fully open). MacConnell arrived to assist shortly thereafter. *See id*. at 26:15.

With Christmas no longer in the driver's seat and the door now completely ajar, MacConnell was able to see two things through the open driver's side door: (1) a gun on the floor of the driver's side seat; and (2) an unzipped but closed backpack on the front passenger's seat. *See* Tr. at 21:20-22:3 (MacConnell testifying that "if you were seated in the driver's seat, it would have been close to where your right foot would be"); 25:24-25 (MacConnell testifying that he could see the backpack from outside of the car, but that "it wasn't until [he] went inside . . . that [he] observed [its contents]"); *see also* Govt.'s Resp. 9 (screenshot of backpack on passenger's

seat).[2]  MacConnell then turned to Rosenbaum, who was still in the process of handcuffing Christmas, and made a gun motion with his hand.  *See* Ex. 2 at 26:43-50 (MacConnell making gun motion and Rosenbaum responding "Where? On him?"); Tr. 22:4-19 (MacConnell testifying that after he made the hand signal, Rosenbaum asked him "where's it at").   While Rosenbaum and Fazio escorted Christmas to the police car, MacConnell stayed behind to retrieve the gun.  Ex. 2 at 27:59-28:06.  Upon going inside the Traverse, MacConnell smelled "a strong odor of marijuana."  Tr. at 26:7-9.   MacConnell then grabbed the backpack, which flapped open as he did, revealing drugs and related paraphernalia.  Ex. 2 at 28:44-48; Tr. at 36:13-17.

After MacConnell retrieved the gun and the backpack containing the drugs and paraphernalia, one of the officers ran a search to see if Christmas had a permit to carry a firearm.  Govt's Resp. 9 ¶ 22.  The search revealed that he did not, so the officers arrested him.  *Id.*

## II.  PROCEDURAL HISTORY

---

[2] The Government contends that the backpack was "open . . . on the passenger seat" and that MacConnell could see inside the backpack "from standing outside" the Traverse.  Govt.'s Resp. 17; *see also id.* at 19 ("While the officers were securing [Christmas], MacConnell observed from outside of the car . . . the apparent drug packaging inside of the open book bag.").  MacConnell's body camera footage says otherwise.  Even though the backpack was unzipped, it was also closed, and it was only *after* MacConnell grabbed the backpack that it flapped open and revealed its contents.  *See* Ex. 2 at 28:44-48; *see also* Tr. at 36:13-17 (MacConnell clarifying that it was only "when [he] grabbed [the backpack], it was open and [he] could see into it.").  The Court therefore finds that the backpack was unzipped but closed.

On October 31, 2023, Christmas was indicted on three counts: (1) possession with intent to distribute (21 U.S.C. § 841(a)(1), (b)(1)(C)); (2) possession of a firearm in furtherance of a drug trafficking crime (18 U.S.C. § 924(c)(1)); and (3) felon in possession (18 U.S.C. § 922(g)(1)).

On October 25, 2024, Christmas moved to suppress admission of the gun, drugs, and drug paraphernalia into evidence. Mot. to Suppress 13, ECF No. 32 (hereinafter "Mot."). Christmas argues that the officers' traffic stop was unlawful; therefore, the evidence seized is fruit of a poisonous tree and must be suppressed at trial.

On November 12, 2024, the Government opposed Christmas' motion. The Government contends that the officers reasonably believed that Christmas, having first swerved through an intersection and then nearly hit a parked car, had committed the traffic violation at issue (careless driving); accordingly, the officers' traffic stop was justified. *See* Govt.'s Resp. 13-17. The Government also contends that MacConnell lawfully seized the evidence at issue under at least one of two theories: (1) the gun was in plain view from the outside of the Traverse, and seeing the gun and smelling marijuana while going to retrieve the gun gave MacConnell probable cause to search the backpack and seize the drugs and related paraphernalia inside; or (2) the officers reasonably suspected that Christmas was armed and dangerous, and

were entitled frisk him and the area within his reach inside the Traverse for weapons. *See* Tr. 42:24-43:16; Govt.'s Resp. 20-25.

On January 28, 2024, the Court held a hearing on Christmas' motion, at which MacConnell and Christmas testified, and MacConnell's body worn camera footage recording the events was introduced into evidence.

## III.    LEGAL STANDARD

The Fourth Amendment forbids "unreasonable searches and seizures." U.S. Const. amend. IV. For a search or seizure to be reasonable, precedent requires a warrant based on probable cause unless an exception applies. *Katz v. United States*, 389 U.S. 347, 356-57 (1967); *United States v. Amos*, 88 F.4th 446, 451 (3d Cir. 2023). "Evidence obtained through unreasonable searches and seizures must be suppressed as 'fruit of the poisonous tree.'" *United States v. Dowdell*, 70 F.4th 134, 139 (3d Cir. 2023) (internal citations omitted). On a motion to suppress, the government bears the burden of showing by a preponderance of the evidence "that each individual act constituting a search or seizure under the Fourth Amendment was reasonable." *United States v. Ritter*, 416 F.3d 256, 261 (3d Cir. 2005).

## IV.    DISCUSSION

Whether the evidence at issue was lawfully seized turns on whether (1) the initial traffic stop of the Traverse was supported by the requisite reasonable suspicion; (2) the plain view doctrine applies; and (3) the officers had reasonable

suspicion that Christmas was armed and dangerous such that they could frisk him and the Traverse. The Court addresses each question in turn.

## A. Whether the initial traffic stop was supported by the requisite reasonable suspicion

Although a traffic stop is a "seizure" within the meaning of the Fourth Amendment, such stops have been "historically reviewed under the investigatory detention framework first articulated in *Terry v. Ohio*[.]" *United States v. Delfin-Colina*, 464 F.3d 392, 396 (3d Cir. 2006) (citing *Terry*, 392 U.S. 1 (1968)). Under *Terry* and its progeny, an officer may "conduct a brief, investigatory stop when [he or she] has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). A traffic stop is justified under *Terry* "whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation." *Arizona v. Johnson*, 555 U.S. 323, 327 (2009); *see also Delfin-Colina*, 464 F.3d at 396, 398 (a traffic stop is lawful "when an objective review of the facts shows that an officer possessed specific, articulable facts that an individual was violating a traffic law at the time of the stop.") (internal citations omitted). To establish lawfulness, an officer "need only produce facts establishing that [he or she] reasonably believed that a [traffic] violation had taken place." *Delfin-Colina*, 464 F.3d at 398.

Applying this "generally undemanding standard" to the facts at hand, the Court concludes that the initial traffic stop was supported by reasonable suspicion. *Id.* at 397; *see also United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006) ("In *Whren v. United States*, the Supreme Court established a bright-line rule that any technical violation of a traffic code legitimizes a stop . . . When one peruses the traffic-stop suppression caselaw, one is struck by how rarely a traffic stop is found to have been illegal.") (citing *Whren*, 517 U.S. 806 (1996)). As MacConnell testified at the January 28 hearing, the officers saw Christmas swerve through the intersection of Loudon and 11th then "almost" hit a parked minivan. Tr. at 14:12-14. These specific, articulable facts are enough to establish that the officers reasonably believed that Christmas was driving with a "careless disregard for the safety of persons or property" in violation of 75 Pa. C.S. § 3714(a).[3]

### B.    Whether the plain view doctrine applies

---

[3] The Court notes that Christmas paints a different picture of his driving in his motion. While he does not dispute that he swerved in the intersection, he argues that he did so to avoid being cut off by "a dark colored four-door compact sedan" that was turning left and blew through a stop sign at the next intersection, citing "pole camera footage" from the intersection of 11th and Loudon. Mot. 6; *see also id.* (positing, again based on pole camera footage, that he "may have 'swerved' as he drove around one of several indented manhole covers . . . as the cost of annual car alignment is high for most vehicles."). The Government refutes Christmas' version of events as "conjecture." Govt.'s Resp. 11. As Christmas did not testify regarding his version of events and his counsel did not present the pole camera footage at the hearing, the Court can only credit MacConnell's testimony and body camera footage (a copy of which was played and introduced into evidence at the hearing).

Even though the Traverse was lawfully stopped for a traffic violation, the Government must still establish by a preponderance of the evidence that the gun, drugs, and related paraphernalia were lawfully seized. The Government's argument is twofold: (1) the gun was lawfully seized because MacConnell "observed [it] in plain view" through the open drivers' side door "while detaining [Christmas] for officer safety"; and (2) while going to retrieve the gun, MacConnell smelled marijuana, which gave him probable cause to search the backpack and seize the drugs and related paraphernalia inside.[4]    Govt.'s Resp. 11; Tr. 42:24-43:16. Christmas contends that plain view does not apply because Rosenbaum had no grounds to "grab" and "immediately put cuffs on him," and it was only after Rosenbaum had done so that MacConnell was able to see the gun. Tr. 48:24-49:20; *see also id.* at 44:20-45:23.[5]

The plain view doctrine "provides grounds for seizure of an item when an officer's access to an object has some prior justification under the Fourth Amendment." *Texas v. Brown*, 460 U.S. 730, 738 (1983). An officer can seize evidence in plain view without a warrant if three requirements are met: (1) the officer

---

[4] In briefing, the Government argued that the drugs and related paraphernalia were also in plain view from outside the Traverse. Govt.'s Resp. 17. Because the Court finds that the backpack's contents were not visible until MacConnell grabbed the backpack, *see supra* n.2, the Court need not address this argument.

[5] Having determined that the initial traffic stop was lawful, the Court likewise need not address Christmas' argument that plain view should not apply because the officers did not reasonably suspect that he was driving carelessly. *See* Mot. 5-10.

did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed; (2) the item's incriminating character was immediately apparent; and (3) the officer had a lawful right to physically access the object itself. *United States v. Menon*, 24 F.3d 550, 559 (3d Cir. 1994).

It is undisputed that Christmas had already begun to open the door of the Traverse before Rosenbaum issued his first order to stay put and show his hands. It is likewise undisputed that (1) Rosenbaum never saw the gun before he removed Christmas from the Traverse; and (2) MacConnell only saw the gun after Rosenbaum had done so. However, the Government has not established by a preponderance of the evidence that MacConnell could have seen the gun had Rosenbaum not swung the door fully open in the process of forcibly removing Christmas from the Traverse. Therefore, deciding whether the officers lawfully seized the gun under the plain view doctrine turns on whether the Government can establish the first requirement: that "the initial intrusion" that allowed MacConnell to see the gun—the traffic stop, including the manner in which it was effected—was permissible under the Fourth Amendment. *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993).

In conducting a lawful traffic stop, officers "may exercise reasonable superintendence over the car and its passengers . . . at least for a brief period of time." *United States v. Bonner*, 363 F.3d 213, 216-17 (3d Cir. 2004). "As a matter of course," officers may order anyone inside a lawfully stopped car to (1) remain inside

with their hands up in the air; or (2) get out. *Maryland v. Wilson*, 519 U.S. 408, 410 (1997); *United States v. Moorefield*, 111 F.3d 10, 11 (3d Cir. 1997); *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977). Officers are also entitled to use "a reasonable amount of force" to effectuate a traffic stop; however, it may not exceed the amount necessary to ensure the safety of the officer and the surrounding public. *Bonner*, 363 F.3d at 216-17; *see also Baker v. Monroe Tp.*, 50 F.3d 1186, 1193 (3d Cir. 1995) (amount and type of force used must be "justified by the circumstances" and courts should "look at the intrusiveness of all aspects of the incident in the aggregate.").

Turning back to the case at hand, Rosenbaum was entitled to order Christmas to stay inside the Traverse with his hands out without any particularized suspicion. *See Moorefield*, 111 F.3d at 11. Rosenbaum likewise *would* have been entitled, as a matter of course, to order Christmas to exit the Traverse. *Mimms*, 434 U.S. at 111 n.6. But that is not what Rosenbaum did. Instead, Rosenbaum "immediately" grabbed Christmas by the wrists, raised them above his head, forcibly pulled Christmas out of the Traverse, and began handcuffing him. *See* Tr. 33:12-17 (MacConnell confirming that Rosenbaum "immediately" detained Christmas in this manner); Ex. 2 at 26:08-23 (body camera footage displaying same). He did so even though the body camera footage shows that Christmas readily complied with his first order to remain inside in the car and show his hands. *See* Ex. 2 at 26:05-07 (body

camera footage displaying Christmas complying).[6]    In light of Christmas'
compliance and the lack of exigency underlying the summary offense for which he
was stopped, the Court cannot conclude that Rosenbaum's use of force was
reasonable or necessary to effectuate the traffic stop or to ensure his safety and the
safety of those around him. *Cf. United States v. Jackson*, 120 F.4th 1210, 1215 (3d
Cir. 2024) (rejecting argument that an officer "took excessive safety measures" in
conducting "felony stop," noting that the officer "found himself alone in a dark
corner of a high-crime neighborhood with three individuals he reasonably suspected
were driving a stolen vehicle and attempting to evade him in the early hours of the
morning.").

In sum, the Court concludes that the Government has not demonstrated by a
preponderance of the evidence that Rosenbaum's forcible removal of Christmas

---

[6] The Government argues that Christmas did not comply with Rosenbaum's first order. *See* Govt.'s
Resp. 6 ¶ 11 ("The defendant appeared upset and at first, he started to get back into his car.  But
he hesitated, sat in the doorway of the driver's seat with at least one foot out of the car and his
hands out of the car . . ."). MacConnell's body camera footage and testimony say otherwise: taken
together, they establish that Christmas had already opened the door, turned his body, and had one
foot dangling outside of the Traverse *before* Rosenbaum ordered him to "stay in the vehicle" and
"to show his hands." *See* Ex. 2 at 26:00-02 (Christmas before Rosenbaum issued order), 26:02-05
(Rosenbaum approaching vehicle issuing order); Tr. 21:2-4, 32:22-33:6 (MacConnell's testimony
about Rosenbaum's order).  Indeed, the only way Christmas *could* fully comply with Rosenbaum's
order to show his hands was to do exactly what the Government attempts to cast as non-compliance
(or, at the very least, hesitant compliance). *See also United States v. Lowe*, 791 F.3d 424, 433 (3d
Cir. 2015) ("[R]esponding to a show of authority by staying put is a means of passively submitting
to that authority[.]") (citing *Brendlin v. California*, 551 U.S. 249, 262 (2007)).

from the Traverse, which allowed MacConnell to see the gun, was permissible under the Fourth Amendment. The plain view exception therefore does not apply.

### C. Whether the officers were entitled to conduct a *Terry* frisk

The Government offers an alternative justification for Rosenbaum's conduct and MacConnell's seizure of the gun, drugs, and related paraphernalia: the officers were entitled to frisk Christmas and the Traverse (including the backpack in the passenger's seat) because they "developed" a reasonable suspicion that he was armed and dangerous over the course of the traffic stop. Govt.'s Resp. 20.

If an officer reasonably suspects a driver might be armed and dangerous, he may frisk the driver and the passenger compartment for weapons under *Terry*. *See Mimms*, 434 U.S. at 111-12 (permitting *Terry* frisk of driver where officer concluded driver was "armed and thus posed a serious and present danger to the safety of the officer"); *Michigan v. Long*, 464 U.S. 1032, 1049-50 (1983) (passenger compartment). In determining whether there is reasonable suspicion that a person is armed and dangerous, officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). Nonetheless, to justify a frisk, an officer must be "able to point to specific and articulable facts which, taken together with rational inferences from those facts,

reasonably warrant that intrusion." *United States v. Kithcart*, 218 F.3d 213, 219 (3d Cir. 2000) (quoting *Terry*, 392 U.S. at 21).

Reasonable suspicion is a "less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Delfin-Colina*, 464 F.3d at 396 (quoting *Wardlow*, 528 U.S. at 123). In deciding whether there was reasonable suspicion, courts consider "the totality of the circumstances . . . ." *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002). "The principal components of a determination of reasonable suspicion . . . will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion." *Ornelas v. United States*, 517 U.S. 690, 696 (1996); *see also Johnson v. Campbell*, 332 F.3d 199, 206 (3d Cir. 2003) ("The ultimate question is whether a reasonable, trained officer standing in [the officer's] shoes could articulate specific reasons justifying [the defendant's] detention."). While courts "give considerable deference to [] officers' determinations of reasonable suspicion," *United States v. Brown*, 765 F.3d 278, 290 (3d Cir. 2014), they "do not owe them blind deference," *United States v. Alvin*, 701 F. Appx. 151, 156 (3d Cir. 2017) (quoting *United States v. Woodrum*, 202 F.3d 1, 7 (1st Cir. 2000)).

The Government posits that Rosenbaum and MacConnell developed reasonable suspicion that Christmas was armed and dangerous based on the

following: (1) Christmas "was traveling in an area known to be frequented with gun and narcotics crimes"; (2) Christmas' purportedly "nervous, evasive" behavior; and (3) Christmas' purported "attempted flight" when he exited the Traverse. *See* Govt.'s Resp. 21-22.[7] The Court will briefly address each and then consider them in their totality.

### 1. The location of the stop

"An individual's presence in an area of expected criminal activity, standing alone, is not enough" to establish reasonable suspicion. *Wardlow*, 528 U.S. at 124; *see also Brown v. Texas*, 443 U.S. 47, 52 (1979) ("The fact that appellant was in a neighborhood frequented by drug users, standing alone, is not a basis for concluding that appellant himself was engaged in criminal conduct."). Nonetheless, the location of a stop is "among the relevant contextual considerations in a *Terry* analysis." *Wardlow*, 528 U.S. at 124.

---

[7] The Government argues that "the firearm . . . and the open back[pack] with drug paraphernalia" also contributed to the officers' reasonable suspicion that Christmas was armed and dangerous. Govt.'s Resp. 20. That is wrong. Reasonable suspicion must be measured by what the officers knew at the moment they frisked Christmas. *See Fla. v. J.L.*, 529 U.S. 266, 271 (2000). It was only after Rosenbaum forcibly removed Christmas from the car that MacConnell was able to see the gun on the floor, and the Government offers no evidence that Rosenbaum saw the gun before MacConnell. Indeed, MacConnell's testimony and body camera footage establishes the opposite: Rosenbaum did not see a gun until MacConnell made a gun signal with his hands, *after* Rosenbaum had forcibly removed Christmas from the car and begun to handcuff him. *See* Tr. 22:4-19 (MacConnell testifying that after he made the hand signal, Rosenbaum asked him "where's it at"); Ex. 2 at 26:43-50 (MacConnell making gun motion and Rosenbaum responding "Where? On him?"); *id.* at 27:27-33 (Rosenbaum again asking MacConnell "it's not on him?"). And, as discussed above, the backpack's contents were not visible until MacConnell grabbed it, which was after Rosenbaum and Fazio had already escorted Christmas away.

The Government notes that the neighborhood and Boom Box Deli itself were "frequented with drug dealing" and that both MacConnell and Rosenbaum had "made numerous arrests related to narcotics and firearms offenses" in the area. Govt.'s Resp. 4 ¶ 8. MacConnell testified that as of 2023, he had been employed as a Philadelphia police officer in the thirty-fifth district—where the stop occurred—for about sixteen years. Tr. 5:8-25, 6:22-25. He also testified that he had served as a member of the Narcotics Enforcement, Tactical, and Violent Crime Response teams, each of which specializes in patrolling and surveilling "high crime and drug areas." *Id*. at 7:14-8:13. Given MacConnell's credible testimony and experience, the Court agrees that the stop occurred in "an area of expected criminal activity." *Id*.

### 2. Christmas' allegedly "nervous, evasive" behavior

The Government contends that Christmas exhibited "nervous, evasive behavior" that gave rise to reasonable suspicion that he could be armed and dangerous.[8] Govt.'s Resp. 22. Like the location of a stop, a suspect's "nervous,

---

[8] The Government contends that Christmas' "moving around, not standing still, and not being cooperative" should factor into this calculus. Govt.'s Resp. 22. To the extent the Government intends to suggest that Christmas exhibited any of these behaviors *before* Rosenbaum forcibly removed him from the Traverse with no explanation, or that Christmas was anything but compliant with Rosenbaum's original order to remain in the car and show his hands, those suggestions are both belied by MacConnell's body camera footage. And to the extent the Government intends to suggest the Court can consider what happened *after* Rosenbaum first seized Christmas in assessing reasonable suspicion, the Government is wrong. *See Johnson*, 332 F.3d at 210 ("As for [suspect's] later uncooperative behavior, that cannot be held against him because it occurred *after* the stop had already begun.") (emphasis in original).

evasive behavior" is not dispositive but can be a "pertinent factor in determining reasonable suspicion." *Wardlow*, 528 U.S. at 124. According to the Government, it started with Christmas' "erratic driving behavior"—namely, his "swerving through the intersection" and his decision to "quickly and recklessly park" after "making eye contact with law enforcement"—and continued up until the point Rosenbaum decided to grab him. Govt.'s Resp. 22. MacConnell testified that as Rosenbaum was ordering Christmas to stay in the car, Christmas "seemed extremely nervous," appeared on the verge of tears, and kept on saying "please don't do this to me." Tr. 20:9-12.[9] Overall, in MacConnell's estimation, Christmas was exhibiting "abnormal behavior" that led the officers to believe that detaining Christmas was necessary for both the officers' and Christmas' own safety. Tr. at 33:18-23; *see also id.* at 34:3-15 (MacConnell expounding on same).

While Christmas may have seemed "nervous," the record does not support that his behavior was "evasive." Mere nervous behavior is not unusual; "[i]t is certainly not uncommon for most citizens—whether innocent or guilty—to exhibit signs of nervousness when confronted by a law enforcement officer." *Alvin*, 701 F. App'x at 155 (quoting *United States v. Wood*, 106 F.3d 942, 948 (10th Cir. 1997)). Moreover, Christmas exhibited nothing but complete submission and compliance to

---

[9] MacConnell's body camera footage has no sound for this portion of Rosenbaum and Christmas' encounter; however, the Court agrees that Christmas appears nervous.

the officers upon them executing their traffic stop, rebutting any plausible inference of evasiveness.  Indeed, as soon as Christmas saw Rosenbaum exit the police car, he remained frozen in place threshold of the Traverse.  *See* Ex. 2 at 26:00-02.  And when Rosenbaum ordered Christmas to remain in the vehicle and show his hands, Christmas readily complied.  *See id*. at 26:02-09.  This is nothing like the behavior courts have deemed "evasive."  *Cf. Wardlow*, 528 U.S. at 676 ("[H]eadlong flight . . . is the consummate act of evasion[.]"); *Johnson*, 332 F.3d at 210 (suspect's "refusal to roll down his window" held to be an "evasive action"); *Jackson*, 120 F.4th at 1222 (suspects in car "made multiple quick, evasive turns" to avoid police).

Finding no reasonable inference that Christmas was "evasive" when the officers were effectuating their traffic stop, the Court will consider only Christmas' nervousness in assessing the totality of the circumstances.

### 3. Christmas' purported "attempted flight"

Flight from police, "combined with other factors," may support a *Terry* stop and frisk.  *United States v. Brown*, 159 F.3d 147, 149 (3d Cir. 1998).  The Government cites Christmas' purported "attempted flight" from the officers as something that factored into their reasonable suspicion that he was armed and dangerous.[10]  Govt.'s Resp. 22.  But neither the body camera footage nor

---

[10] The Government further claims that Christmas' conduct was "behavior consistent with a person trying to distance themselves from something," and that Rosenbaum "had experience interacting with individuals who were trying to distance themselves from firearms or narcotics doing the

MacConnell's testimony suggest that (1) Christmas attempted to flee or (2) an objectively reasonable officer would have believed he was trying to flee. Quite the opposite. As discussed above, the footage shows that just as the police car came to a complete stop, Christmas slowly began opening the door of the Traverse but stopped moving as soon as Rosenbaum exited the police car. Ex. 2 at 26:00-02. And as soon as Rosenbaum gave his order for Christmas to stay in the car and show his hands, Christmas complied. *Id.* at 26:02-09. If anything, Christmas' instantaneous submission to and compliance with Rosenbaum's show of authority was the antithesis of "flight." *Cf. Bonner*, 363 F.3d at 215 (after officer pulled over car for traffic violation and "approached the driver's side of the vehicle, [suspect] alighted and ran."); *United States v. Brown*, 159 F.3d 147, 149 (3d Cir. 1998) (suspect "turned and ran into an alley" after seeing a marked police car); *Wardlow*, 528 U.S. at 122 (2000) (suspect "looked in the direction of the officers and fled"); *United States v. Shambry*, 392 F.3d 631, 632 (3d Cir. 2004) (suspect "fled on foot" after officer asked him to "come here"). In sum, the Court finds that nothing in the record supports the contention that Christmas attempted to flee from the officers at any point—let alone prior to his forcible removal from the vehicle.

---

same." Govt.'s Resp. 6 ¶ 13. However, this argument is not supported by the record: Rosenbaum did not testify at the hearing and MacConnell offered no such testimony. It is Rosenbaum and MacConnell—not the Government—who "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant[ed]" their frisk. *Terry*, 392 U.S. at 21.

### 4. Totality of the circumstances

Based on the totality of the circumstances, the Court cannot conclude that the Government has established by a preponderance of the evidence that the officers had reasonable suspicion that Christmas was armed and dangerous.

"As the Supreme Court has emphasized, 'the demand for specificity in the information upon which police action is predicated is the central teaching of Fourth Amendment jurisprudence.'" *Johnson*, 332 F.3d at 210 (quoting *Cortez*, 449 U.S. at 418). With this demand for specificity in mind, the Court finds that the officers in this case have failed to "articulate a chain of inferences that led logically" to reasonable suspicion that Christmas was armed and dangerous. *Id*. Christmas' careless driving certainly furnished reasonable suspicion of a traffic violation. But even though the traffic stop occurred in a high-crime area, little else could have given rise to the *separate* reasonable suspicion that Christmas was armed and dangerous in the roughly one minute between Christmas' traffic violation and his forcible removal from the Traverse.[11]  As noted above, Christmas may have appeared

---

[11] The Court of Appeals for the Third Circuit's recent decision in *United States v. Jackson* provides a useful point of comparison. 120 F.4th 1210 (3d Cir. 2024). In *Jackson*, the Court affirmed that an officer's decision to frisk passengers in a vehicle was reasonable, in part because the officer "reasonably believed he was pursuing a stolen vehicle" and "car theft is a crime that often involves the use of weapons and other instruments of assault that could jeopardize [] officer safety." *Id.* at 1221 (quoting *United States v. Bullock*, 510 F.3d 342, 347 (D.C. Cir. 2007) (Kavanaugh, J.)). The same cannot be said of Christmas' careless driving: unlike car theft, it is "a summary offense" and likewise does not "often involve the use of weapons and other instruments of assault." 75 Pa. C.S. § 3714(a); *Jackson*, 120 F.4th at 1221; *see also* 75 Pa. C.S. § 3101(b) (distinguishing certain offenses as "serious traffic offenses," not including careless driving under § 3714(a)).

nervous, but nothing about his behavior was evasive.  And though the Government attempts to cast Christmas as having "attempted flight" from the officers, the body camera footage tells a different story:  Christmas was nothing but submissive and compliant before Rosenbaum forcibly removed him from the car.

Considering these circumstances as a whole, the Court concludes that the officers did not have the requisite reasonable suspicion that Christmas was armed and dangerous to justify to frisking Christmas or the Traverse.

## V.     CONCLUSION

The initial traffic stop of Christmas' Traverse was lawful.  Nonetheless, the Government has failed to demonstrate by a preponderance of the evidence that the gun, drugs, and related paraphernalia were reasonably seized.  The Court will therefore grant Christmas' Motion to Suppress in full.  A separate Order will follow.